2018 IL App (1st) 170996

SIXTH DIVISION
Opinion filed: June 1, 2018

No. 1-17-0996

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* Liquidation of LUMBERMENS MUTUAL CASUALTY COMPANY, | ) ) ) | Appeal from the Circuit Court of Cook County |
| (PEOPLE OF THE STATE OF ILLINOIS *ex rel.* JENNIFER HAMMER, Director of Illinois Department of Insurance, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | No.   12 CH 24227 |
| LUMBERMENS MUTUAL CASUALTY COMPANY, an Illinois domestic property and casualty mutual company, AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, an Illinois domestic property and casualty mutual company, and AMERICAN MOTORISTS INSURANCE COMPANY, an Illinois domestic stock insurance company, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | Honorable |
| (California Insurance Guarantee Association, Claimant-Appellee)). | ) ) | Kathleen M. Pantle, Judge, Presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justices Cunningham and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1    The People of the State of Illinois *ex rel.* Jennifer Hammer, Director of Insurance (Director), brought this action against the defendants, Lumbermens Mutual Casualty Company, American Manufacturers Mutual Insurance Company, and American Motorists Insurance Company (collectively referred to as "Lumbermens"), seeking to liquidate Lumbermens' assets. The Director filed a petition for the interim allowance of claims for administrative expenses of certain guaranty associations. The claimant, California Insurance Guarantee Association (CIGA), objected on grounds that the petition improperly required it to reimburse itself from funds held in a special deposit. The circuit court sustained CIGA's objection, finding that California law prohibited CIGA from using special deposits to pay for general administrative expenses. The Director filed this interlocutory appeal pursuant to Rule 304(b)(2) (Ill. S. Ct. R. 304(b)(2) (eff. Mar. 8, 2016)), seeking reversal of that order. For the reasons that follow, we affirm.

¶ 2    The facts giving rise to the instant appeal are not in dispute. Lumbermens is a multi-state property and casualty insurance company organized under the laws of Illinois. Among other things, it provided workers' compensation insurance services to California residents. California insurance law required Lumbermens to "deposit cash instruments" or "interest bearing securities" at a California bank (hereinafter referred to as a "special deposit"), which would be held in trust for the benefit of "workers in [that] state" as a condition to Lumbermens writing workers' compensation insurance in California. See Cal. Ins. Code § 11691 (West 2012). By requiring insurance carriers to maintain such special deposits, California ensures that adequate funds are available to pay compensable workers' compensation claims in the event that the insurer becomes insolvent.

¶ 3     For many years, Lumbermens was successful and earned profits from its insurance operations and, by year-end 2000, it ranked among the top 20 largest property and casualty insurance companies and the top 5 largest workers' compensation insurers in the United States with $2.7 billion in net premiums and more than $2 billion in surplus. The four largest states for its insurance business were California, Illinois, New York, and Texas, which collectively comprised more than 40% of the insurance group's insurance business. Beginning in 2003, however, Lumbermens began suffering from certain financial difficulties and, in July 2003, the company agreed to operate under a runoff plan subject to "corrective orders" issued by the Director.[1] See 215 ILCS 5/186.1 (West 2002). During this time, the Director issued over 500 corrective orders and Lumbermens' liability was reduced from nearly $7 billion to just under $1 billion.

¶ 4     Nonetheless, in August 2012, the Director filed a complaint for rehabilitation pursuant to section 192 of the Illinois Insurance Code (Code) (215 ILCS 5/192 (West 2012)). The Director alleged that Lumbermens' financial condition rendered further transaction of business by the company hazardous to its policyholders, its creditors, and the public. The board of directors of Lumbermens voted to submit voluntarily to rehabilitation proceedings, and on August 16, 2012, an agreed order was entered appointing the Director rehabilitator of the company.

¶ 5     On March 8, 2013, the Director filed a complaint for liquidation with a finding of insolvency pursuant to section 188 of the Code (215 ILCS 5/188 (West 2012)). On May 8, 2013, the circuit court entered an order of liquidation with a finding of insolvency and authorized the

---

[1] Pursuant to the runoff plan, Lumbermens could not issue any new policies; rather, it could only collect premiums and pay claims under existing policies.

Director to liquidate Lumbermens.[2] The liquidation order triggered the statutory obligations of state guaranty associations, such as CIGA, to pay the covered claims of Lumbermens' insureds located within their respective states.

¶ 6    On May 28, 2013, shortly after the circuit court entered the liquidation order, the Commissioner of the California Department of Insurance issued an administrative order pursuant to section 11698(a) of the California Insurance Code (Cal. Ins. Code § 11698(a) (West 2012)), directing that the funds held in Lumbermens' special deposit be immediately transferred to CIGA and held in a segregated account. Tracking the language of section 11698.3(b), the administrative order states, in pertinent part, as follows:

> "AND, FURTHER, that CIGA shall use the proceeds of the workers' compensation deposit and any interest earned thereon *** solely in accordance with the provisions of CIC section 11698.3(b) for the payment of compensable workers' compensation claims arising under the insolvent insurer's policies and which are otherwise covered claims, *** and all expenses related thereto."

Finally, the administrative order provides that "CIGA shall return the surplus to the Liquidator of [the Lumbermens Estate]."

¶ 7    In the months following entry of the liquidation order, guaranty associations began adjusting claims under Lumbermens' policies and also began submitting claims to the Director for reimbursement of administrative expenses related to the payment of covered claims.

---

[2] By statute, the Director serves as the receiver of insolvent insurance companies domiciled in Illinois. 215 ILCS 5/191 (West 2012). As the domiciliary receiver, the Director "shall be vested by operation of law with the title to all property, contracts and rights of action of the company as of the date of the order directing *** liquidation." *Id.* Section 193 of the Code grants the Director broad powers to "immediately proceed to liquidate the property, business, and affairs of the company." 215 ILCS 5/193 (West 2012).

¶ 8   On November 19, 2014, the Director filed a petition for the interim allowance of claims for administrative expenses of certain state guaranty associations pursuant to section 205(1)(a) of the Code (215 ILCS 5/205(1)(a) (West 2014)). A key element in the Director's petition was the treatment of guaranty associations that had access to Lumbermens' special deposits. Some guaranty associations, such as CIGA, had access to the special deposit that Lumbermens posted as a condition of entering that state's insurance marketplace. Other guaranty associations, however, did not have access to special deposits or, if they did, had either returned the deposit to Lumbermens or already used the funds by paying covered claims.[3]

¶ 9   Relevant here, the Director's petition provides that the amount distributed to a guaranty association for administrative expenses would be reduced by the amount that the guaranty association has received, or can receive, from a special deposit. In other words, guaranty associations such as CIGA would be required to exhaust the funds held in their state's special deposit before they could receive disbursements for administrative expenses from the general assets of the Lumbermens estate. The Director sought to prevent guaranty associations from receiving a preference by virtue of having access to a special deposit.

¶ 10   In January 2016, CIGA filed the instant objection to the Director's petition. It argued that, under California law, it could not use the special deposit to reimburse itself for general administrative expenses such as rent, postage, telephone, lighting, cleaning, heating, and electricity because those expenses are not "related" to the payment of a "compensable workers' compensation claim." More specifically, CIGA argued that, pursuant to section 11698.3(b) of the

---

[3] The Director's petition alleged that 9 of 29 guaranty associations whose claims are being recommended for allowance at level (a) of the priority schedule have access to their state's special deposit. An additional eight guaranty associations, whose claims are either under review or have not yet been submitted, also have access to their state's special deposit. The record reflects that California holds a Lumbermens special deposit in the amount of $167 million.

California Insurance Code, special deposits shall only be used to pay "compensable workers' compensation claims" and "all expenses related thereto." Cal. Ins. Code § 11698.3(b) (West 2012). According to CIGA, the phrase "all expenses related thereto" applies to "allocated loss adjustment expenses" (ALAE), which are expenses attributable to the processing of specific insurance claims. CIGA argued that the imposition of an exhaustion requirement is not only contrary to California law, but defeats the purpose of the special deposit—namely, to protect California residents who had workers' compensation insurance with Lumbermens. Second, CIGA argued that the Director is required under Illinois law to "*promptly* pay the guaranty associations' expenses *out of estate assets within [her] control*" (emphasis in original), and may not discriminate or give preferential treatment to guaranty associations based on whether or not they have access to a special deposit. The record reflects that CIGA had submitted over $8 million in general administrative expenses for which it sought reimbursement.[4]

¶ 11 In response, the Director argued that special deposits are general assets of the Lumbermens estate and, because she has title to those funds, it is appropriate for the circuit court to approve her petition requiring guaranty associations with access to special deposits to reimburse themselves for administrative expenses. The Director also disputed CIGA's claim regarding the use of funds held in California's special deposit. She asserted that the phrase "all expenses related thereto" in section 11698.3(b) of the California Insurance Code is plain and unambiguous and applies to both ALAE and general administrative expenses incurred by CIGA in adjusting workers' compensation claims by Lumbermens policyholders.

---

[4] According to the affidavit of Tony Kennedy, CIGA's director of finance, as of March 31, 2016, CIGA paid approximately $48 million in workers' compensation claims and ALAE. He expects that CIGA's liability for covered claims and ALAE to reach $326 million, which far exceeds the $167 million held in the special deposit.

¶ 12    Following a hearing on the objection, the circuit court entered a written order on March 22, 2017, finding that section 11698.3(b) of the California Insurance Code did not authorize CIGA to use special deposit funds to reimburse itself for general administrative expenses. In so holding, the court agreed with CIGA's argument that the phrase "all expenses related thereto" applies only to ALAE. In so holding, the court reasoned that section 11698.3(b) should be "harmonized" with section 11698.02 of the California Insurance Code (*id.* § 11698.02), which similarly restricts the use of special deposit proceeds to the payment of "compensable workers' compensation claims" and "allocated claims expense[s] necessary to pay those claims." It further reasoned that the Director's broad interpretation of section 11698.3(b) would produce a result inconsistent with "clearly expressed legislative intent of [the California Insurance Code], as millions of dollars would go to overhead costs of CIGA and not to insured workers of California for whom the funds are reserved." Therefore, the circuit court sustained CIGA's objection to the Director's petition for the interim allowance of claims of certain guaranty associations for administrative expenses.[5] The Director filed this interlocutory appeal pursuant to Rule 304(b)(2) (Ill. S. Ct. R. 304(b)(2) (eff. Mar. 8, 2016)), seeking reversal of that order.

¶ 13    In urging reversal of the circuit court's order, the Director contends that the funds held in special deposits are "general assets" of the Lumbermens estate and, therefore, are subject to distribution under the priority scheme set forth in section 205(1)(a) of the Code. In addition, she argues that the circuit court erred in construing section 11698.3(b) of the California Insurance Code.

---

[5] Because the circuit court found that California law barred CIGA from using special deposit funds to pay for general administrative expenses, it did not address whether the Director's proposed distribution was authorized under the priority scheme set forth in section 205(1)(a) of the Code (215 ILCS 5/205(1)(a) (West 2014)).

¶ 14 The disposition of this appeal hinges on our construction of articles XIII and XIII$^1/_2$ of the Code, as well as article 1 of the California Insurance Code. Article XIII of the Code provides the basic mechanism for the liquidation of Lumbermens. 215 ILCS 5/187 *et seq.* (West 2012). Article XIII$^1/_2$, commonly referred to as the Uniform Insurers Liquidation Act (UILA), governs "the affairs of delinquent domestic companies" that have assets and liabilities in multiple states. 215 ILCS 5/221.1 *et seq.* (West 2012). Meanwhile, article 1 of the California Insurance Code governs special deposits by workers' compensation insurers. "Because the construction of a statute presents a question of law, we review the underlying judgment *de novo*." *Manago v. County of Cook*, 2017 IL 121078, ¶ 10. "In construing a statute, our goal is to effectuate the intent of the legislature, with the plain and unambiguous language enacted providing the most reliable indicator of that intent." *Id.* Whenever possible, courts must enforce clear and unambiguous statutory language as written, without reading in unstated exceptions, conditions, or limitations. *People ex rel. Glasgow v. Carlson*, 2016 IL 120544, ¶ 17.

¶ 15 In order to put this dispute into perspective, we begin our analysis by setting forth the statutory framework governing the liquidation of multi-state insurance companies. The liquidation of insurance companies doing business in multiple states presents unique problems that have been alleviated in many states, to some extent, by the adoption in one form or another of the UILA. The UILA was created to facilitate coordination among the states for the orderly resolution of insolvent insurance companies. Because insurers are barred from seeking federal bankruptcy protection, the UILA establishes an alternative statutory scheme and provides a uniform method for processing claims against, and distributing assets of, insolvent insurance companies with assets and policyholders in multiple jurisdictions throughout the United States. See 215 ILCS 5/221.10 (West 2012) (the purpose of the UILA "is to promote uniformity in the

liquidation, rehabilitation, reorganization or conservation of insurers doing business in more than one state."). One of the core "embarrassments" that the UILA sought to remedy was "the ineffective administration of the liquidation process caused by differences in the laws of the various States regarding the title and right to possession of the property of a defunct nonresident insurer." *Murphy Co. v. Reserve Insurance Co.*, 54 N.Y.2d 69, 76-77 (1981). The UILA employs two primary mechanisms to accomplish its uniform scheme. First, it provides a uniform set of laws to determine issues such as preference and control and title to assets. Second, and more relevant to the analysis here, the UILA establishes a receivership system to enhance cooperation between reciprocal states in which the insolvent insurance company did business.

¶ 16    Under the UILA, when an insurer is declared insolvent, a domiciliary receiver will be appointed to assume possession and control of the insurer and its assets in the state where the insurer is incorporated or organized. 215 ILCS 5/221.1(4) (West 2012). The domiciliary receiver is then entitled to recover the assets, "except as to special deposits," of the insurer in reciprocal states.[6] *Id.* § 221.2. If the insurer has sufficient assets located within another state, however, an ancillary receiver may be appointed in that state with the sole right to recover the assets of the insurer located within that state and to settle certain claims related to such domestic assets of the insurer that are under the ancillary receiver's control. *Id.* Under the UILA, ancillary proceedings in reciprocal states are intended to resolve claims related exclusively to special deposit claims and secured claims in those states, with all remaining assets to be transferred to the domiciliary receiver. *Id.* § 221.8.

---

[6] "Reciprocal State" is defined by the UILA as any other state in which the "substance and effect the provisions of Sections 221.1 to 221.10, both inclusive are in force." *Id.* § 221.1(1)(b). Both parties acknowledge that California has enacted the UILA and is a reciprocal state.

¶ 17     Illinois's policy regarding the domiciliary receiver's authority over the general assets of an insolvent insurance company's estate, and the ancillary receiver's authority over special deposits, is consistent with the policy in California, which adopted the UILA in article 14.3 of the California Insurance Code. See Cal. Ins. Code § 1064.1 *et seq.* (West 2012). The provisions of California's UILA concerning interstate relations mimic those of Illinois's. By adopting the UILA, both states seek to secure equal treatment for all creditors of defunct insurance companies, wherever situated.

¶ 18     With this framework in mind, we now turn to the Director's contention that funds held in special deposits are "general assets" of the Lumbermens estate and, thus, subject to the distribution scheme set forth in section 205(1) of the Code. In support of her argument, the Director cites to section 187(6) of the Code, which defines "assets" as "all deposits and funds of a special or trust nature." 215 ILCS 5/187(6) (West 2012). The definition relied upon by the Director, however, is taken from article XIII of the Code and is expressly limited to the provisions of that article. See *id.* ("The word 'assets' *as used in this Article* includes all deposits and funds of a special or trust nature." (Emphasis added.)). Because Lumbermens is a domestic insurance company with assets and liabilities in multiple states, and since the special deposit in question is located in California, a reciprocal state, the provisions of article XIII$^{1}/_{2}$ (*i.e.*, the UILA) apply. See 215 ILCS 5/221.1 ("this Article shall apply to the administration by the Director of the affairs of delinquent domestic companies with respect to matters affecting or related to reciprocal states"). Therefore, we rely upon the definition of "general assets" appearing in the UILA.

¶ 19     Section 221.1(6) of the UILA defines "[g]eneral [a]ssets" as "all property, real or personal, *not specifically *** deposited as security or otherwise encumbered*, and as to such

specifically encumbered property[,] the term includes all [funds held] in excess of the amount necessary to discharge the sum or sums secured." (Emphasis added.) *Id.* § 221.1(6). The funds in question in this case are held in a special deposit as security for the payment of workers' compensation claims in California and, based on the statutory language, are expressly excluded from the general assets of the Lumbermens estate. Nowhere in the definition of "general assets" in section 221.1(6) does it state that funds held in special deposits are included within the ambit of the term. As a result, because these funds were "deposited as security" for the special benefit of local policyholders in California, they are not "general assets" of the Lumbermens estate. See *State ex rel. Ingram v Reserve Insurance Co.*, 303 N.C. 623, 629 (1981) (special deposits "constitute a *trust* for the benefit of *** policyholders and are not *assets* of the insolvent insurance company" (emphasis in original)).

¶ 20    Indeed, this construction comports with other provisions of the UILA, which routinely distinguishes between general assets and special deposits, and recognizes the right of ancillary receivers (not domiciliary receivers) to liquidate claims against special deposits. For example, unlike general assets, which are subject to the priority scheme set forth in section 205(1) of the Code, funds held in special deposits must be distributed "in accordance with the provisions of the statutes requiring the creation and maintenance of such special deposits." 215 ILCS 5/221.6 (West 2012). Thus, whatever section 11698.3 of the California Insurance Code provides relating to the priority of special deposit claims, controls. Moreover, section 221.8 of the Code distinguishes between general assets and special deposits by providing that, only after all claims have been paid, does any surplus or excess amount remaining in a special deposit become part of the general assets of the estate and shall be transferred to the domiciliary receiver. 215 ILCS 5/221.8 (West 2012). Applying the Director's broad understanding of the term "general assets"

11

to include special deposits would render the provisions in sections 221.6 and 221.8, meaningless. We conclude, therefore, that the funds held in special deposits are not general assets of the Lumbermens estate.

¶ 21　Having found that the funds held in special deposits are not general assets of the Lumbermens estate, resolution of this appeal requires us to address two issues: First, we must address the parties' disagreement as to whether section 11698.3 of the California Insurance Code (Cal. Ins. Code § 11698.3 (West 2012)) bars CIGA from using special deposit funds to pay for general administrative expenses. Second, we must decide whether the Director's petition, which seeks to impose an exhaustion requirement on some guaranty associations, violates the priority scheme set forth in section 205(1)(a) of the Code (215 ILCS 5/205(1)(a) (West Supp. 2017)). We address each issue in turn.

¶ 22　To determine the proper construction of section 11698.3 of the California Insurance Code, we must look to California case law. *Magee v. Huppin-Cleck*, 279 Ill. App. 3d 81, 87 (1996). A search of California cases reveals that its courts have not, as yet, construed the statute. "Where a statute has not been construed by the courts of the State in which it was enacted, a court of another jurisdiction in which a question with respect to the effect of such statute arises may place its own construction thereon." *Ray Schools-Chicago, Inc. v. Cummins*, 12 Ill. 2d 376, 380 (1957). However, "[b]ecause rules for statutory construction are [a] means for ascertaining substance, those employed in the enacting State are most relevant." *Magee*, 279 Ill. App. 3d at 88. Accordingly, in construing section 11698.3 of the California Insurance Code, we turn to principles of statutory construction adhered to by California courts. See *id.* (applying the "principles of statutory construction adhered to by Oregon courts" to construe an Oregon statute).

¶ 23    The California Supreme Court has set forth the following principles for interpreting statutes. The primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *McCarther v. Pacific Telesis Group*, 48 Cal. 4th 104, 110 (2010). Legislative intent is best derived from the language of the statute itself, which, if unambiguous, should be enforced as written, without resorting to extrinsic aids for construction. *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036, 1047 (1999). Additionally, the entire statute must be read as a whole, considering all relevant parts. *McCarther*, 48 Cal. 4th at 110. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and no provision should be rendered useless or superfluous. *Id.* As a general rule, courts accord deference to the interpretation of a statue by the agency charged with its administration. *Ste. Marie v. Riverside County Regional Park and Open-Space District*, 46 Cal. 4th 282, 292 (2009). However, an agency's interpretation is not binding and will be rejected if it is erroneous. *Id.*

¶ 24    CIGA was created in 1969 with the purpose of protecting residents in California who make claims under policies issued by insurers that have become insolvent. *California Insurance Guarantee Ass'n v. W.C.A.B.*, 112 Cal. App. 4th 358, 363 (2003). It "issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations." *California Insurance Guarantee Ass'n v. Workers' Compensation Appeals Board*, 153 Cal. App. 4th 524, 532 (2007). Rather, its role is limited to paying the amount of covered claims of an insolvent insurer. *Id.* Because CIGA is a statutory entity, it depends on the California Insurance Code for its existence and for a definition of the scope of its powers, duties, and protections. *California Insurance Guarantee Ass'n*, 112 Cal. App. 4th at 363-64.

¶ 25    Here, the parties dispute the interpretation of section 11698.3 of the California Insurance Code, which governs CIGA's use of special deposit funds where a member insurer is subject to an order of liquidation with a finding of insolvency. Section 11698.3 provides as follows:

"(a) If the insurer is a member insurer of [CIGA] and has been the subject of an order of liquidation or receivership with a finding of insolvency which has been entered by a court of competent jurisdiction [CIGA] then becomes obligated to pay compensable workers' compensation claims arising under the insurer's policies, which are otherwise "covered claims" ***. The commissioner shall immediately take control or possession of the deposit required pursuant to Section 11691 and shall transfer the deposit to [CIGA].

(b) [CIGA] shall use the proceeds of the deposit and any interest earned thereon, for the *payment of compensable workers' compensation claims* arising under the insolvent insurer's policies and which are otherwise covered claims, *** and *all expenses related thereto*." (Emphasis added.) Cal. Ins. Code § 11698.3(a)-(b) (West 2012).

The Director argues, as she did before the circuit court, that the phrase "all expenses related thereto" authorizes CIGA to use special deposit funds to pay for *all expenses*, including general administrative expenses. We disagree.

¶ 26    In our view, the words in section 11698.3(b) are clear, and the language is not susceptible to more than one reasonable interpretation. Section 11698.3(b) plainly states that special deposit proceeds must be used solely for the payment of compensable workers' compensation claims arising under Lumbermens' policies and all expenses *related thereto*. The legislature's use of the phrase "related thereto" limits the type of expenses that CIGA may pay to those directly related

14

to the payment of compensable workers' compensation claims. As noted by CIGA, these types of expenses are commonly referred to as "allocated claims expenses," "loss adjustment expenses," and "allocated loss adjustment expenses" or ALAE. See *Woodliff v. California Insurance Guarantee Ass'n*, 110 Cal. App. 4th 1690, 1694 (2003) ("In the insurance industry, the phrase 'loss adjustment expenses' generally means the expense incurred by the insurer to investigate and settle a claim."); *20th Century Insurance Co. v. Garamendi*, 8 Cal. 4th 216, 250 (1994) (defining allocated loss adjustment expenses or ALAE as "the costs associated with the adjustment of specific claims"). Expenses related to the payment of compensable workers' compensation claims typically includes, for example, court costs; attorney fees; costs of undercover and detective services; fees of independent medical examiners; costs of employing expert witnesses; court reporter costs; and costs of depositions. See, *e.g.*, *Huff v. Integral Insurance Co.*, 354 S.W.3d 228, 231-32 (2011); *Planet Insurance Co. v. Mead Reinsurance Corp.*, 789 F.2d 668, 672 (9th Cir. 1986). General administrative expenses, in contrast, are "expense[s] incurred in running a business, as distinguished from *** expense[s] incurred in manufacturing or selling; overhead. Examples include executive and clerical salaries, rent, utilities, and legal and accounting services." Black's Law Dictionary (10th ed. 2014); see also *Huff*, 354 S.W.3d at 232 (noting that "the salaries of officials, administrators or other employees or normal overhead charges such as rent, postage, telephone, lighting, cleaning, heating or similar expenses" are excluded from the definition of ALAE). Put simply, general administrative expenses are not related to the payment of a specific workers' compensation claim. As a consequence, CIGA is not authorized to use the funds held in the special deposit to pay for general administrative expenses.

15

¶ 27    The Director argues that, if the California legislature sought to limit the type of expenses payable from special deposit proceeds, it could have easily done so by removing the phrase "all expenses related thereto" and inserting the phrase "allocated claims expense" as it did in section 11698.02 of the California Insurance Code. See Cal. Ins. Code § 11698.02 (West 2012) ("The proceeds of the deposit *** shall be used solely to pay compensable workers' compensation claims under the insured or reinsured policies, *allocated claims expense* necessary to pay those claims, and expenses connected with all proceedings *** in furtherance of the payment of those claims ***." (Emphasis added.)). According to the Director, the phrase "*all expenses* related thereto" is broad and evinces the legislature's intent that special deposit proceeds be used to pay for both ALAE and general administrative expenses. The Director appears to argue that if the legislature uses certain words in one instance and different words in another, it intends different results. We are not persuaded.

¶ 28    As noted by CIGA, the California Insurance Code uses several terms interchangeably when referring to the types of expenses payable from special deposit funds. See, *e.g.*, *id.* § 1063.2(d) ("allocated claims expense"); *id.* § 11691(a)(1) ("loss adjustment expenses"); *id.* § 11698.02 ("allocated claims expense" and "expenses connected with all proceedings"). All of these phrases, however, mean the same thing—namely, expenses related to the investigation and settlement of covered claims. We can discern no reason why the minor differences in the statutory phrases "expenses related thereto," "expenses connected with all proceedings," "loss adjustment expenses," and "allocated claims expense" should require different interpretations. See *Delaney v. Baker*, 20 Cal. 4th 23, 41-42 (1999) (where the same, or substantially the same, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning, where the legislative intent is not clearly expressed to the

16

contrary). Our reading does not raise concerns about redundancy or surplusage sometimes associated with reading dissimilar terms to mean the same thing. Only one reasonable interpretation of these phrases exists—CIGA may use special deposit funds to pay for expenses related to the payment of covered claims, which includes compensable workers' compensation claims. By giving the same meaning to the phrases "all expenses related thereto," "allocated claims expense," and "loss adjustment expenses," we give meaning and effect to both sections 11698.3(b) and 11698.02 of the California Insurance Code.

¶ 29   In light of the California Insurance Code's salutary policy of protecting policyholders of insolvent insurers, which is clearly and repeatedly expressed throughout its many articles, we reject any argument that the California legislature intended section 11698.3(b) to authorize CIGA to use special deposit funds to pay for general administrative expenses. Accordingly, we hold that section 11698.3(b) of the California Insurance Code does not authorize CIGA to use funds held in Lumbermens' California special deposit to pay for general administrative expenses.

¶ 30   Next, we address the issue of whether the Director's petition requiring CIGA to reimburse itself for general administrative expenses from Lumbermens' California special deposit violates the priority scheme set forth in section 205(1)(a) of the Code (215 ILCS 5/205(1)(a) (West Supp. 2017)).

¶ 31   Article XIII of the Code provides the basic mechanism for the liquidation of Lumbermens. Our supreme court has long recognized that the object of article XIII is to secure a ratable distribution of an insolvent insurance company's assets. *People ex rel. Jones v. Chicago Lloyds*, 391 Ill. 492, 498 (1945), *rev'd on other grounds*, *Morris v. Jones*, 329 U.S. 545 (1947). It was designed to provide a comprehensive, orderly and efficient procedure for liquidating insurance companies while protecting the rights of interested parties. *In re Liquidation of*

17

*Security Casualty Co.*, 127 Ill. 2d 434, 447 (1989). To avoid preferential treatment of creditors, article XIII protects individual policyholders and other claimants without permitting certain classes of creditors to place themselves in a superior position. *In re Liquidation of Coronet Insurance Co.*, 298 Ill. App. 3d 411, 418 (1998). Section 205(1) of the Code establishes the following priority of distribution of an insolvent insurance company's assets:

"(a) The costs and expenses of administration, including, but not limited to the following:

(i) The reasonable expenses of the Illinois Insurance Guaranty Fund *** and of any similar organization in any other state, including overhead, salaries, and *other general administrative expenses* allocable to the receivership (administrative and claims handling expenses and expenses in connection with arrangements for ongoing coverage) ***.

\* \* \*

(b) Secured claims *** that are secured by liens perfected prior to the filing of the complaint.

(c) Claims for wages actually owing to employees for services rendered within 3 months prior to the date of the filing of the complaint, ***.

(d) Claims by policyholders, beneficiaries, insureds and liability claims against insureds covered under insurance policies and insurance contracts issued by the company ***.

(e) Claims by policyholders, beneficiaries, and insureds, the allowed values of which were determined by estimation under paragraph (b) of subsection (4) of Section 209.

(f) Any other claims due the federal government.

(g) All other claims of general creditors ***.

(h) Claims of guaranty fund certificate holders, guaranty capital shareholders, capital note holders, and surplus note holders.

(i) Proprietary claims of shareholders, members, or other owners."

(Emphasis added.) 215 ILCS 5/205(1)(a)-(i) (West Supp. 2017).

Section 205(1) establishes a rule of absolute priority in which no succeeding class of claimants may share in the distribution of assets until the allowed claims of all senior interests have been satisfied in full. *In re Liquidations of Reserve Insurance Co.*, 122 Ill. 2d 555, 558 (1988).

¶ 32    The language of section 205(1)(a) is plain, unambiguous, and expansive. It states that guaranty associations are entitled to recover their "reasonable expenses" including "overhead, salaries, and other general administrative expenses," (215 ILCS 5/2015(1)(a)(i) (West Supp. 2017)), which are precisely the types of expenses for which CIGA seeks reimbursement from the general assets of the Lumbermens estate. Nothing in section 205(1)(a) requires the exhaustion of a special deposit fund before guaranty associations are entitled to a distribution from the estate for the payment of general administrative expenses.

¶ 33    The Director nevertheless seeks to circumvent our rules of statutory construction by improperly adding a condition—*i.e.*, an exhaustion requirement—to section 205(1)(a)(i)'s clear and unambiguous terms. If the legislature intended to impose an exhaustion requirement on guaranty associations with access to special deposits, it could have readily done so. Indeed, during the pendency of this appeal, section 205 was amended by the Illinois General Assembly (see Pub. Act 100-410, § 5 (eff. Aug. 25, 2017)), and is now far more detailed than it once was.[7]

---

[7] Section 205(3) states that the "changes made in this Section by this amendatory Act of the 100th

Prior to the amendment, section 205(1)(a)(i) simply provided that guaranty associations were entitled to reimbursement of "[t]he costs and expenses of administration." Section 205 now provides that guaranty associations may recover "[t]he reasonable expenses ***, including overhead, salaries, and other general administrative expenses allocable to the receivership (administrative and claims handling expenses and expenses in connection with arrangements for ongoing coverage)." 215 ILCS 5/2015(1)(a)(i) (West Supp. 2017). The expansive language added to section 205(1)(a)(i) refutes any claim that the legislature intended to create a limitation on guaranty associations that have access to funds in a special deposit.

¶ 34    The Director contends, however, that absent an exhaustion requirement, guaranty associations such as CIGA, which has access to special deposits, will place themselves in a superior position over guaranty associations in states that have little or no funds in their special deposits. The Director asserts that her proposed plan "equalizes" treatment of all guaranty associations by preventing CIGA from using the special deposit solely for the benefit of Lumbermens' policyholders in California. We disagree.

¶ 35    This court considered and rejected a similar argument in *In re Conservation of Alpine Insurance Co.*, 318 Ill. App. 3d 457 (2000). In that case, the Director engaged in discussions with Alpine regarding a possible plan for rehabilitation. Alpine proposed dividing its policyholders into two classes: (1) those having insurance through Alpine (Alpine-only insured); and (2) those having additional insurance through other carriers (Alpine multiple policy insureds). According to the plan, Alpine would first pay the claims of Alpine-only insureds. As to the other class, the proposed plan required that they exhaust their other insurance coverage before seeking to recover

General Assembly apply to all liquidation, *** proceedings that are pending on the effective date of this amendatory Act *** and to all future liquidation, rehabilitation, or conservation proceedings." 2015 ILCS 5/205(3) (West Supp. 2017).

on Alpine's policies. *Id.* at 459. Alpine argued that its plan was the only way to ensure that the claims of its policyholders would be paid in full. The circuit court entered summary judgment in favor of the Director and Alpine appealed. *Id.* at 460. On appeal, this court affirmed. We reasoned that:

> "Alpine's proposed rehabilitation plan creates a new class of claimants altogether, namely Alpine multiple policy insureds, and subordinates those claims to those of Alpine-only insureds in direct contravention of the Illinois supreme court's holding that '[s]ection 205(1) establishes a rule of absolute priority.' [Citation.] Section 205(1)(d) simply does not provide for the subordination of the claims of multiple policy claimants to those of single policy claimants. In other words, the Code does not provide for the punishment of multiple policy insureds based on the fortuitous circumstance of their seeking out additional coverage." *Id.* at 462.

We concluded that Alpine's proposed rehabilitation plan was "impermissibly discriminatory and therefore illegal." *Id.* at 463.

¶ 36    Similarly, here, the effect of the Director's petition—imposing an exhaustion requirement on guaranty associations *with* access to special deposit funds—is to subordinate their claims for administrative expenses to the claims of guaranty association *without* access to special deposits. By imposing an exhaustion requirement on some guaranty associations, but not others, the Director has effectively created a new, sub-class of guaranty associations, which contradicts the statutory goal of "equivalent distribution to creditors of the same class of priority." See *In re Liquidation of Security Casualty Co.*, 127 Ill. 2d at 444; *In re Liquidation of Pine Top Insurance Co.*, 322 Ill. App. 3d 693, 705 (2001).

¶ 37    We are not insensitive to the plight of guaranty associations and citizens of states who have and will continue to suffer financially as a result of the lack of special deposits. However, this court is not tasked with evaluating and setting public policy (*Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 79); that job is reserved for our respective, duly elected, legislatures (*Blumenthal v. Brewer*, 2016 IL 118781, ¶ 80). Indeed, we lack any objective standards or procedures to assist us in weighing the relative merits of such widely divergent public policy interests. See *id.* ¶ 77 (the legislature alone possesses the necessary investigative and fact-finding abilities). The Director's dissatisfaction with the UILA and article XIII does not furnish authority for us to rewrite this legislation. We decline the Director's invitation to look outside the plain and unambiguous statutory language to weigh the merits of the allegedly competing public policy interests underlying article XIII and the UILA.

¶ 38    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39    Affirmed.