2023 IL App (1st) 211370

No. 1-21-1370

Opinion filed May 12, 2023

Fifth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* LIQUIDATION OF LEGION INDEMNITY COMPANY | ) ) ) | Appeal from the Circuit Court of Cook County |
| (Dana Popish Severinghaus, in Her Official Capacity as Director of the Department of Insurance, Acting Solely in Her Capacity as the Statutory and Court-Affirmed Liquidator of Legion Indemnity Company, | ) ) ) ) ) | |
| | ) | No. 02 CH 6695 |
| Liquidator-Appellee, | ) ) | |
| v. | ) ) | |
| Catalina Holdings (Bermuda) Limited, | ) | Honorable |
| | ) | Celia G. Gamrath, |
| Claimant-Appellant). | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    After being found insolvent, Legion Indemnity Company (Legion) began undergoing court-ordered liquidation. During the liquidation proceedings, the director of the Department of Insurance, acting solely in his capacity as the statutory and court-affirmed liquidator of Legion (Director), demanded arbitration against Catalina Holdings (Bermuda) Limited (Catalina), who

had assumed responsibility for multiple reinsurance treaties entered into with Legion, for amounts allegedly owed under the treaties. Catalina counterclaimed for unpaid premiums. The arbitration panel rejected the claims on behalf of Legion and awarded Catalina the unpaid premiums as well as attorney fees, costs, and interest, if the award was not timely paid. After having that award confirmed by a federal court and converted into a judgment, Catalina filed claims in the circuit court to have its award paid. Ultimately, the circuit court allowed Catalina's claims and determined that the unpaid premiums as well as the attorney fees, costs, and arbitration interest were claims of a general creditor. As a result, Catalina's claims were afforded the seventh highest priority in the Illinois Insurance Code's priority distribution scheme of assets from the estate of an insurance company undergoing liquidation. See 215 ILCS 5/205(1) (West 2020). In addition to allowing Catalina's claims, the court denied Catalina statutory postjudgment interest under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)).

¶ 2     Catalina now appeals the circuit court's order, contending that, based on the plain language of the Insurance Code's priority distribution scheme, its claim solely for attorney fees, costs, and arbitration interest should be deemed a cost and expense of administration (215 ILCS 5/205(1)(a) (West 2020)), the highest priority of the Insurance Code's priority distribution scheme. Additionally, Catalina posits that it was entitled to statutory postjudgment interest on its arbitration award that was converted into a judgment under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)). For the reasons that follow, we affirm the circuit court of Cook County.

¶ 3                              I. BACKGROUND

¶ 4                           A. Legion's Liquidation

¶ 5       Legion was an insurance company licensed in the state of Illinois. Between 1998 and 2001, Legion entered into multiple quota-share reinsurance treaties with Alea Group Limited and related entities (the Alea Entities), under which the Alea Entities agreed to reinsure and indemnify Legion for a portion of certain business written or assumed by Legion. In April 2002, the Director believed that Legion was financially impaired and filed a complaint for an order of conservation against it.[1] Based on the complaint, the circuit court entered an order of conservation against Legion, resulting in the Director taking possession and control of Legion. Subsequently, the Director filed a complaint seeking an order of liquidation with a finding that Legion was insolvent.

¶ 6       In April 2003, the circuit court found that Legion was insolvent and entered an order of liquidation. That order affirmed the Director as the statutory liquidator and provided him with various powers listed in the Insurance Code.[2] See, *e.g.*, 215 ILCS 5/191, 193 (West 2002). One such power included the Director's ability to "bring any action, claim, suit, or proceeding *** against any other person with respect to that person's dealings with [Legion]." *Id.* § 193(3). The court's order also vested the Director "with the right, title and interest in all funds recoverable under any insurance policies, and any treaties and agreements of excess insurance or reinsurance" entered into by Legion. In addition, the Director had various obligations, including providing timely written notice to reinsurers of the pendency of a claim against Legion indicating the policy or bond reinsured. *Id.* § 193(8)(b). As a result of the court's order of liquidation, an estate was created comprised of all the assets and liabilities of Legion. *Id.* § 191.

¶ 7       Throughout the next several years, there were various court-ordered claim deadlines. Eventually, more than 2200 proofs of claims were timely filed in the liquidation proceedings,

_____

[1]At the time, the Director was Nathaniel S. Shapo.
[2]At the time, the Director was J. Anthony Clark.

consisting primarily of priority (g) claims (claims of general creditors). Meanwhile, all priority (a) claims—those for costs and expenses of administration—were paid on an ongoing basis. By January 2015, the circuit court had approved a 100% distribution on all timely filed claims in the liquidation proceedings. Because Legion's estate had sufficient assets remaining, the court set a new deadline for any additional claims to be filed in the matter. Over the next few years, the court continued to approve distributions to claims based on the priority distribution scheme of the Insurance Code.

¶ 8                                    B. Catalina and Legion

¶ 9      In 2009 and 2014, Catalina bought the Alea Entities. Based on these acquisitions, Catalina assumed responsibility for the various reinsurance treaties that the Alea Entities had entered into with Legion. These reinsurance treaties contained mandatory and binding arbitration clauses for any dispute arising out of the reinsurance agreements except for issues involving injunctive relief. Additionally, these clauses provided that the arbitrators "may award interest and costs."

¶ 10     In 2014, the Director sent Catalina a commutation offer claiming a balance of approximately $1 million owed to Legion's estate under the various reinsurance treaties. According to Catalina, this offer was the first time it had received any communication of an issue regarding the reinsurance treaties with Legion. After Catalina refused to pay, the Director demanded arbitration to recover the alleged money owed based on the arbitration clauses in the reinsurance treaties. The Director also sought an award of attorney fees and costs. In response, Catalina counterclaimed, arguing that it was owed unpaid premiums from Legion under the reinsurance treaties and sought an award of attorney fees and costs.

¶ 11     In June 2018, following an arbitration hearing, a panel issued an "Initial Final Award," determining that Legion failed to comply with the Insurance Code as well as the reinsurance

treaties concerning obligations to provide notice to Catalina within a reasonable time after each proof of claim was filed in the liquidation proceedings. Because of this failure, the panel concluded that Legion's claims were time-barred and Catalina was relieved of all obligations to pay any amounts owed. Additionally, the panel concluded that Catalina proved it was entitled to unpaid premiums and awarded it $76,602.63. Lastly, the panel noted that, given the circumstances, it was "unreasonable for [Catalina] to bear the costs of having to respond to and defend" the arbitration brought by Legion and granted Catalina "an adverse award of fees and costs incurred" due to proceedings. On July 31, 2018, the arbitration panel issued its "Final Award" that reaffirmed and incorporated its initial final award. The panel also awarded Catalina $437,501.04 in attorney fees and costs to be paid by Legion. Further, the panel ordered Legion to pay Catalina the amounts owed within 30 days, otherwise interest would accrue at 6% per annum, compounded quarterly, until Catalina was paid in full. Catalina subsequently filed a petition to confirm the arbitration award in the United States District Court for the Northern District of Illinois. On April 6, 2020, the district court confirmed the award and converted it into a judgment in favor of Catalina and against the Director, as liquidator of Legion.

¶ 12    Catalina sought to have the Director pay the entire judgment outside of the liquidation proceedings. But the Director's attorney informed Catalina that the Director could not pay the judgment without court approval and Catalina had to file a proof of claim with the Office of the Special Deputy Receiver (OSDR), a nonprofit corporation representing the Director under the Insurance Code. See 215 ILCS 5/202 (West 2020). In June 2020, Catalina submitted four proof of claim forms with the OSDR totaling $76,602.63. Those four claims were based on the reinsurance treaties and corresponded to the unpaid premiums owed to Catalina, as determined by the arbitration panel.

¶ 13    The following month, Catalina issued a citation to discover assets against the Director in a separate case outside the liquidation proceedings. According to the Director, because Catalina could only enforce the arbitration judgment through the original liquidation proceedings, he requested Catalina dismiss the citation and follow the proper procedure. In October 2020, because Catalina had not voluntarily dismissed its citation, the Director accepted service of the citation and moved to dismiss it. The circuit court granted the motion finding, in part, the Insurance Code expressly provided that only the liquidation court had jurisdiction to distribute assets of the estate of an insurance company undergoing liquidation.[3]

¶ 14                    C. The Priority of Catalina's Claims

¶ 15    In November 2020, the Director filed a motion in the liquidation case to allow Catalina's claims at the priority (g) level for claims of general creditors. See *id.* § 205(1)(g).[4] The Director argued that all claims arising out of reinsurance agreements are claims of general creditors. As a result, the Director requested an order approving his recommendation that Catalina's claims of $76,602.63 in unpaid premiums and $437,501.04 in attorney fees and costs be allowed for purposes of participating in any second-round distribution on late-filed claims from assets of Legion's estate at the priority (g) level. The Director's motion did not mention the interest awarded by the arbitration panel.

¶ 16    In response, Catalina initially conceded that its claims for unpaid premiums should be allowed at the priority (g) level. However, Catalina contested the amount of the attorney fees and costs claim as stated in the Director's motion to allow and posited that the Director's motion did not include the accrued interest to date. To this end, Catalina claimed that it was owed $535,661.21,

---

[3]This dismissal order was entered by Judge Patrick J. Heneghan.
[4]At the time of the filing, the Director was Robert H. Muriel.

which consisted of $437,501.04 in attorney fees and costs as well as $98,160.17 in interest. The amount of interest included the interest awarded by the arbitration panel at 6% per annum, compounded quarterly, from 30 days after the award until April 6, 2020, when the district court granted Catalina's petition to confirm the award and converted the award into a judgment. Following this judgment, according to Catalina, interest began to accrue at 9% per annum as postjudgment interest under 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)). With the amount of its claim accurately calculated, Catalina argued its adverse award of attorney fees, costs, and interest were costs and expenses of administration and should be allowed at the priority (a) level.

¶ 17    The Director filed a reply in support of its motion to allow, asserting that Catalina was not entitled to any interest on its claim.[5] The Director argued that Catalina's claim for attorney fees and costs were not costs and expenses of administering Legion's estate but rather arose from a contract dispute over reinsurance treaties. As such, the Director argued that, under settled law, these claims had to be administered at the priority (g) level for claims of general creditors. The Director therefore requested that the court approve her request, as stated in the motion to allow.

¶ 18    Following a September 2021 hearing on the Director's motion, the circuit court took the matter under advisement, but ordered Catalina's attorney to provide the court with a calculation of the claimed interest owed. Later that month, Catalina provided the court with its calculation of interest asserting that it was entitled to $43,712.50 in interest from August 30, 2018—30 days after the final arbitration award—until April 6, 2020—when the district court granted Catalina's petition to confirm and converted the arbitration award into a judgment. And Catalina asserted it was

---

[5]At the time of the filing, the Director was Dana Popish Severinghaus.

entitled to $63,242.42 in postjudgment interest under section 2-1303 of the Code of Civil Procedure (*id.*) from April 7, 2020, until September 22, 2021, calculated at 9% per annum. In total, Catalina posited that it was owed $544,455.96.

¶ 19    On September 27, 2021, the circuit court granted the Director's motion to allow Catalina's claim of $76,602.63 in unpaid premiums, $437,501.04 in attorney fees and costs, and $43,712.50 in interest at a rate of 6% from August 30, 2018—30 days after the final arbitration award—until April 6, 2020, when the federal district court granted Catalina's petition to confirm and converted the arbitration award into a judgment in favor of Catalina.[6] The court concluded that all amounts owed to Catalina were to be assessed at the priority (g) level for claims of general creditors for purposes of participating in any second-round distribution of assets from Legion's estate on late-filed claims and rejected Catalina's argument that its attorney fees, costs, and interest should be considered costs and expenses of administration. The court allowed the 6% interest, as awarded by the arbitration panel and confirmed by the federal district court, but denied Catalina any statutory postjudgment interest relying on *In re Liquidation of Pine Top Insurance Co.*, 322 Ill. App. 3d 693 (2001). Additionally, the court acknowledged that, based on the statutory language, postjudgment interest under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)) was mandatory. But it found that, pursuant to *Finley v. Finley*, 81 Ill. 2d 317 (1980), it had discretion as a chancery court to disallow postjudgment interest when it would not comport with justice and equity. To this end, the court determined that allowing postjudgment interest in the instant case "would not comport with justice and equity."

¶ 20    Thereafter, Catalina timely appealed.

---

[6]This order was entered by Judge Celia G. Gamrath.

¶ 21                                    II. ANALYSIS

¶ 22                          A. Priority Distribution Scheme

¶ 23    Catalina first contends that the circuit court erred in determining that its adverse award of attorney fees, costs, and interest should be distributed at the priority (g) level for claims of general creditors rather than at the priority (a) level for costs and expenses of administration. This contention requires us to interpret the Insurance Code's priority distribution scheme of assets from the estate of an insurance company undergoing liquation. See 215 ILCS 5/205(1) (West 2020).

¶ 24    When we interpret a statute, our primary goal is to determine and give effect to the intent of our legislature in enacting the particular provision at issue. *Cassidy v. China Vitamins, LLC*, 2018 IL 122873, ¶ 17. "The statutory language, given its plain and ordinary meaning, is generally the most reliable indicator of that legislative intent, but a literal reading must fail if it yields absurd, inconvenient, or unjust results." *Id.* If the words of a particular provision are not defined in the statute, we will interpret them using their common and ordinary meaning. *Midwest Sanitary Service, Inc. v. Sandberg, Phoenix & Von Gontard, P.C.*, 2022 IL 127327, ¶ 24. Although a particular provision of a statute may be at issue, we cannot view the provision in isolation, but rather must view the provision in the context of the statute at large and consider its subject matter and overall purpose. *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 12. When the language of a statute is clear and unambiguous, we must adhere to its plain language and meaning. *Id.* We cannot "read[ ] into it exceptions, limitations, or conditions that the legislature did not express." *Id.* However, if the language is ambiguous, we may utilize aids of statutory construction and other sources to determine the legislature's intent. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13. The interpretation of a statute is a question of law, which means our review proceeds *de novo*. *Midwest*, 2022 IL 127327, ¶ 19.

¶ 25    Article XIII of the Insurance Code provides the general framework for the liquidation of an insolvent insurance company like Legion. See 215 ILCS 5/187 to 221 (West 2020). After the circuit court enters an order of liquidation, title to all the property, contracts, and rights in action of the insurance company undergoing liquidation becomes vested by operation of law in the Director and his or her successors. *Id.* § 191. The court's order of liquidation creates an estate of the company undergoing liquidation that includes all of its assets and liabilities. *Id.* Article XIII of the Insurance Code further details the duties and responsibilities of the Director, as liquidator, how parties can file claims and, ultimately, how a claim is allowed, which generally requires the approval of the circuit court. See *id.* §§ 191, 193, 208 to 209. Important for this case, article XIII of the Insurance Code provides a distribution scheme of the assets of the company undergoing liquidation based on priority. See *id.* § 205. Our legislature created the priority distribution scheme, in part, to provide an orderly, efficient, and comprehensive process for liquidating the assets of insolvent insurance companies. *In re Liquidation of Lumbermens Mutual Casualty Co.*, 2018 IL App (1st) 170996, ¶ 31. The scheme "protect[s] individual policyholders and other claimants without permitting certain classes of creditors to place themselves in a superior position." *Lincoln Towers Insurance Agency, Inc. v. Boozell*, 291 Ill. App. 3d 965, 970 (1997).

¶ 26    The priority distribution scheme has nine levels of priority, beginning with priority (a) and ending with priority (i). 215 ILCS 5/205(1)(a) to (i) (West 2020). Priority (a), the highest priority, consists of "[t]he costs and expenses of administration." *Id.* § 205(1)(a). Next comes priority (b), which is for secured claims, followed by employee wage claims (priority (c)), claims by policyholders, beneficiaries, and insureds under various policies and agreements with the insolvent insurance company (priority (d) and (e)), and then, any claims due the federal government (priority (f)). *Id.* § 205(1)(b) to (f). The next priority is priority (g), which is for "[a]ll other claims of general

creditors not falling within any other priority under this Section including claims for taxes and debts due any state or local government which are not secured claims and claims for attorneys' fees incurred by the company in contesting its conservation, rehabilitation, or liquidation." *Id.* § 205(1)(g). The final two priorities are not relevant for this appeal. Under the priority distribution scheme, the claimants of the higher priority level must be satisfied in full before the claimants of a lower priority level can receive a distribution. See *In re Liquidations of Reserve Insurance Co.*, 122 Ill. 2d 555, 558 (1988). If there are insufficient assets to fully satisfy higher priority claims, then all lower priority claims receive no distribution of assets from the liquidation proceedings. *Id.*

¶ 27    Our supreme court has interpreted the Insurance Code's priority distribution scheme in the context of reinsurance agreements. In *In re Liquidations of Reserve*, two insurance companies were undergoing liquidation, and the Director, as the liquidator of both companies, filed a petition in both cases seeking a determination "that all claims against [the companies] as reinsurers [were] 'claims of general creditors.' " *Id.* at 557. The cases were consolidated and reached our supreme court, which stated the issue was "whether claims arising out of reinsurance agreements between insurance companies" were claims of general creditors or claims of policyholders, beneficiaries, and insureds under insurance policies and insurance contracts issued by the companies undergoing liquidation. *Id.* at 558. The court highlighted that reinsurance agreements were different than traditional insurance contracts in both form and substance given that reinsurance agreements could only be entered into by certain insurance companies and the original policyholders were not a party to the reinsurance agreements. *Id.* at 561-62. As such, the interests involved in reinsurance agreements were different than in direct insurance agreements. *Id.* at 562. Furthermore, the court determined that, based upon various provisions of the Insurance Code, the terms " 'insurance' " and " 'reinsurance' " were intended to have different meanings. *Id.* at 563. As a result, the court

- 11 -

found that reinsurance agreements could not be subsumed into any provision simply using the term "insurance contract." *Id.* The court asserted that, had the legislature "intended to include reinsurance agreements" along with traditional insurance contracts in terms of priority, "it would have explicitly mentioned reinsurance agreements." *Id.* Having failed to do so, our supreme court concluded that "all claims against [the two insurance companies undergoing liquidation] arising out of reinsurance agreements *** are claims of general creditors." *Id.* at 563-64, 568.

¶ 28    Given our supreme court's decision in *In re Liquidations of Reserve*, Catalina concedes, as it did in proceedings below, that its claims for the unpaid premiums owed to Catalina totaling $76,602.63 must be assigned to priority level (g) for claims of general creditors (215 ILCS 5/205(1)(g) (West 2020)). However, Catalina argues that its adverse arbitration award of attorney fees, costs, and interest was a liability incurred by the Director, as liquidator, in the active administration of Legion's estate, thus qualifying as a cost and expense of administration and assigned the highest level of priority. See *id.* § 205(1)(a).

¶ 29    The phrase "costs and expenses of administration" is not defined in the Insurance Code, and neither are its constituent words. However, our legislature has given clues about the phrase by expressly including certain costs and expenses as costs and expenses of administration. First, costs and expenses of administration include:

> "[t]he reasonable expenses of the Illinois Insurance Guaranty Fund, the Illinois Life
> and Health Insurance Guaranty Association, and the Illinois Health Maintenance
> Organization Guaranty Association and of any similar organization in any other
> state, including overhead, salaries, and other general administrative expenses
> allocable to the receivership (administrative and claims handling expenses and

expenses in connection with arrangements for ongoing coverage)." *Id.* § 205(1)(a)(i).

In addition, our legislature has expressly included:

"[t]he expenses expressly approved or ratified by the Director as liquidator or rehabilitator, including, but not limited to, the following:

(1) the actual and necessary costs of preserving or recovering the property of the insurer;

(2) reasonable compensation for all services rendered on behalf of the administrative supervisor or receiver;

(3) any necessary filing fees;

(4) the fees and mileage payable to witnesses;

(5) unsecured loans obtained by the receiver; and

(6) expenses approved by the conservator or rehabilitator of the insurer, if any, incurred in the course of the conservation or rehabilitation that are unpaid at the time of the entry of the order of liquidation." *Id.* § 205(1)(a)(ii).

Although these express costs and expenses of administration were added to section 205 of the Insurance Code in 2017 (see Pub. Act 100-410, § 5 (eff. Aug. 25, 2017) (amending 215 ILCS 5/205)), our review of the legislative history of the public act did not reveal any guidance as to what our legislature intended by the phrase "costs and expenses of administration." But still, as noted, the express costs and expenses of administration are themselves helpful. Section 205(1)(a)(i) allows Illinois guaranty entities—entities that act as a safety net for the payment of

covered claims in the event an insurer becomes insolvent (see 215 ILCS 5/531.02, 532 (West 2020))—and other similar organizations in other states to recover their reasonable expenses, such as overhead, salaries, and other general administrative expenses. See also *In re Liquidation of Lumbermens*, 2018 IL App (1st) 170996, ¶ 32 (finding the plain and unambiguous language of section 205(1)(a)(i) was to allow guaranty associations the ability "to recover their 'reasonable expenses' "). Meanwhile, section 205(1)(a)(ii) involves the expenses incurred, and approved or ratified by the Director, in his or her role as the statutory and court-affirmed liquidator or rehabilitator, in the process of liquidating or rehabilitating an insurance company.

¶ 30    While the legislature has expressly included certain costs and expenses as those of administration, we can also look to the dictionary, particularly Black's Law Dictionary, for guidance on the plain and ordinary meaning of the phrase "costs and expenses of administration." See *Midwest*, 2022 IL 127327, ¶ 24; *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 32. According to Black's Law Dictionary, "administration" means "[t]he management or performance of the executive duties of a government, institution, or business; collectively, all the actions that are involved in managing the work of an organization" or "[i]n public law, the practical management and direction of the executive department and its agencies." Black's Law Dictionary (11th ed. 2019). Additionally, Black's Law Dictionary defines "expense" as "[a]n expenditure of money, time, labor, or resources to accomplish a result" and "cost" as "[t]he amount paid or charged for something." Black's Law Dictionary (11th ed. 2019). Putting the constituent words together, the plain and ordinary meaning of "costs and expenses of administration" is generally the amount paid or charged for something, or the expenditure of money, time, labor, or resources to accomplish a result during the management or performance of liquidating or rehabilitating an insolvent insurance company. This general definition dovetails with the costs and expenses our

legislature has expressly included as being costs and expenses of administration, particularly those approved or ratified by the Director.

¶ 31    Given the plain and ordinary meaning of the phrase "costs and expenses of administration" and the express inclusion of certain costs and expenses by our legislature, we can deduce what our legislature intended by that phrase. In doing so, our legislature intended two prongs of costs and expenses. First, our legislature intended to cover the reasonable expenses, such as overhead, salaries and other general administrative expenses, of guaranty associations in Illinois and other states. And second, our legislature intended to cover the amounts paid or charged, or the expenditure of money, time, labor, or resources of the Director, or those on his or her behalf, marshaling and distributing the insolvent insurer's assets. Moreover, implicit in the term "of administration" is the fact that the costs and expenses have a postliquidation or postrehabilitation basis because there can only be an administration of the estate of an insolvent insurance company after an order of liquidation or rehabilitation. Given this legislative intent, our legislature did not intend to include as costs and expenses of administration an adverse award of attorney fees, costs, and interest of a claimant incurred while defending a claim from the Director, as liquidator, in arbitration that had a preliquidation genesis. Furthermore, as discussed, in *In re Liquidations of Reserve*, 122 Ill. 2d at 558, 563-64, 568, our supreme court held that "all claims [against an insurance company undergoing liquidation] arising out of reinsurance agreements" are claims of general creditors. And in the instant case, the attorney fees, costs, and interest awarded to Catalina in arbitration arose out of the reinsurance treaties between it and Legion. Those treaties contained binding arbitration clauses for any dispute arising out of the reinsurance agreements and allowed the arbitrators to award interest and costs if they so decided. Stated otherwise, but for the arbitration clauses in the reinsurance treaties, Catalina would not have been awarded the attorney fees, costs,

and interest upon which they base their claim. As such, it was the dispute based on the reinsurance treaties that led to Catalina being awarded attorney fees, costs, and interest. Therefore, in light of *In re Liquidations of Reserve*, Catalina's award of attorney fees, costs, and interest must be assigned to priority level (g) for claims of a general creditor.

¶ 32    Nevertheless, Catalina raises several arguments in support of its position that the attorney fees, costs, and interest awarded to it in arbitration were costs and expenses of administration. For one, Catalina posits that, based on Merriam-Webster's definitions of the phrase's constituent words, "costs and expenses of administration" include all losses arising from the liquidator's management of the estate. Supporting this argument, Catalina notes that section 205(1)(a) uses the phrase "including, but not limited to" (215 ILCS 5/205(1)(a) (West 2020)), which it asserts demonstrates a legislative intent to interpret the statutory provision broadly. Catalina is correct that our legislature's use of the phrase "including, but not limited to" is an indication that a subsequent list is not exhaustive. See *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 369 (1998). When our legislature uses this phrase, "the class of unarticulated things will be interpreted as those that are similar to the named things." *Id.* But here, the costs and expenses of administration enumerated in section 205(1)(a) are fundamentally different than an adverse award of attorney fees, costs, and interest to a party in arbitration called upon to defend itself from a claim brought by the Director on behalf of a company undergoing liquidation. Furthermore, Catalina's arguments based on dictionary definitions and statutory canons of construction cannot overcome our supreme court's holding in *In re Liquidations of Reserve*, 122 Ill. 2d at 558, 563-64, 568, that "all claims [against an insurance company undergoing liquidation] arising out of reinsurance agreements" are claims of general creditors.

¶ 33    Still, Catalina attempts to distinguish *In re Liquidations of Reserve* from the instant facts, arguing that the decision is inapplicable because it involved preliquidation debts incurred by insurance companies undergoing liquidation, whereas the instant case involves a postliquidation debt incurred by the Director, as liquidator. We acknowledge the claims in *In re Liquidations of Reserve*—nonpayment of certain obligations by the two insurance companies undergoing liquidation to reinsurers—are unlike Catalina's claim for attorney fees, costs, and interest based on an adverse arbitration award. But in *In re Liquidations of Reserve*, our supreme court did not make a distinction based upon the nature of the claim from the reinsurer. Rather, our supreme court used broad and all-encompassing language in arriving at its holding that "all claims [against an insurance company undergoing liquidation] arising out of reinsurance agreements" are claims of general creditors. *Id.* Given this broad and inclusive language, *In re Liquidations of Reserve* applies regardless of the fact that the instant case involves a postliquidation debt for attorney fees, costs, and interest because that award still arose from the reinsurance treaties.

¶ 34    Yet, Catalina posits that its adverse arbitration award did not truly arise out of the reinsurance treaties with Legion. Catalina highlights that the arbitration panel awarded it attorney fees and costs because, based on the circumstances, it was "unreasonable" for Catalina to bear the costs of defending the arbitration brought by Legion. Catalina further highlights that the arbitration clauses in the reinsurance treaties did not contain a contractual right for the prevailing party to recover costs. It therefore argues that the treaties did not provide the basis for the arbitration panel's award of attorney fees and costs. Rather, according to Catalina, the award arose from the panel's consideration of equity and reasonableness, namely the Director's failure to adhere to the notice requirement of the Insurance Code. See 215 ILCS 5/193(8)(b) (West 2020). However, there would

be no adverse award of attorney fees and costs but for the arbitration clauses in the reinsurance treaties, and thus, its adverse award of attorney fees and costs arose from the reinsurance treaties.

¶ 35   Catalina additionally asserts that rejecting its argument that an adverse award of attorney fees, costs, and interest are costs and expenses of administration conflicts with section 194(a) of the Insurance Code (*id.* § 194(a)), otherwise known as the "fixing provision." *In re Liquidation of Pine Top*, 322 Ill. App. 3d at 703. Under section 194(a), upon the circuit court's entry of an order of liquidation, "[t]he rights and liabilities of the [insolvent] company and of its creditors, policyholders, stockholders or members and all other persons interested in its assets, except persons entitled to file contingent claims, shall be fixed" unless otherwise ordered by the court. 215 ILCS 5/194(a) (West 2020). This provision "is intended to stop the running of any debts, including postjudgment interest, against the insolvent insurer in order to give the liquidator an opportunity to marshal the insurer's assets and pay its debts." *In re Liquidation of Pine Top*, 322 Ill. App. 3d at 703-04.

¶ 36   According to Catalina, the fixing provision creates two distinct time periods: (1) debts that existed before liquidation, which are fixed as of the date of the court's order of liquidation, and (2) debts incurred after the date of the court's order of liquidation while the Director, as liquidator, administers and manages the estate of the insolvent insurance company. Implicit in such an argument is that these latter debts are costs and expenses of administration and priority (a) claims. However, section 194(a) does not provide for this treatment of postliquidation debts, and the only case Catalina cites for support, *In re Liquidation of Pine Top*, merely describes the purpose of the fixing provision. But assuming *arguendo* that Catalina's argument is correct, Catalina's adverse award of attorney fees, costs, and interest still has a preliquidation basis because it was the dispute

based on the reinsurance treaties that led to Catalina's adverse award. And because this award has a preliquidation genesis, the award is not a cost or expense of administration.

¶ 37    In addition, Catalina highlights section 202(e)(2) of the Insurance Code (215 ILCS 5/202(e)(2) (West 2020)), which creates a right to indemnification from the assets of the company's estate for the Director, his or her employees, and his or her advisors where "a cause of action is commenced against" them "either personally or in their official capacity" arising out of their actions "within the scope of their duties or employment involving a company in liquidation." The right to indemnification generally includes "all expenses, attorneys' fees, judgments, settlements, decrees, fines, penalties, or amounts paid in satisfaction of or incurred in the defense of the cause of action." *Id.* Moreover, "[a]ny indemnification, expense payments, and attorneys' fees from the company's assets for actions against" the Director, his or her employees, and his or her advisors "shall be considered an administrative expense of the estate." *Id.* According to Catalina, it is inconsistent to hold that a judgment against the liquidator personally constitutes an administrative expense, but a judgment against the liquidator acting as liquidator does not qualify as such. Catalina argues that, in both cases, the judgment arises from actions taken by the liquidator within his or her scope of his authority to manage the estate.

¶ 38    However, as aptly noted by the Director, Catalina's arguments rest on the assumption that its claim for attorney fees, costs, and interest is a claim against the Director, as liquidator, rather than a claim against the estate, which is not the case. Catalina's overall contention is that its claim for attorney fees, costs, and interest should be assessed at the priority (a) level under section 205(1) of the Insurance Code. See *id.* § 205(1). That provision states that "[t]he priorities of distribution of general assets from the *company's estate* is to be as follows." (Emphasis added.) *Id.* In other

words, Catalina's claim is against Legion's estate, not the Director, as liquidator. Catalina's attempt to find an inconsistency in the statute is unpersuasive.

¶ 39    Catalina also posits that an interpretation that its adverse award of attorney fees, costs, and interest is not a cost or expense of administration will lead to absurd results, namely creating a class of general creditors deprived of the ability to file a timely claim under the Insurance Code. " '[A] court construing the language of a statute will assume that the legislature did not intend to produce an absurd or unjust result' [citation], and will avoid a construction leading to an absurd result, if possible." *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 283 (2010) (quoting *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 541 (1992)). However, our legislature did not view such a situation as being possibly absurd or unjust because it explicitly included provisions for claims filed after the court-imposed deadline, how those late-filed claims can be deemed timely filed, and how, ultimately, those claims are paid out. See 215 ILCS 5/208(2), (3) (West 2020).

¶ 40    To further support its position that its adverse award of attorney fees, costs, and interest are costs and expenses of administration, Catalina relies on various decisions based on bankruptcy proceedings, including *Reading Co. v. Brown*, 391 U.S. 471 (1968), and its progeny, such as *Yorke v. National Labor Relations Board*, 709 F.2d 1138 (7th Cir. 1983), and *In re Beyond Words Corp.*, 193 B.R. 540 (N.D. Cal. 1996). As acknowledged by the Director, bankruptcy cases can be persuasive authority. See *In re Liquidation of Pine Top*, 322 Ill. App. 3d at 704 ("We find support for our position in cases pertaining to federal bankruptcy and equitable receivership proceedings, both of which are analogous to proceedings to liquidate an insolvent insurance company.").

¶ 41    In *Reading*, 391 U.S. at 483-85, the United States Supreme Court held "that damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give

rise to 'actual and necessary costs' " of operating the business of the debtor under a Chapter 11 bankruptcy case and thus are assigned the highest priority under bankruptcy law as administrative expenses. However, the instant case does not involve the alleged negligence, let alone any tort, of the Director in his or her role in liquidating Legion. Rather, in this case, Catalina's claim for attorney fees, costs, and interest were based upon discretionary fee-shifting provisions in arbitration clauses of reinsurance treaties, which themselves were based on a contractual dispute that predated Legion's court-ordered liquidation.

¶ 42    To be sure, in *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385 (5th Cir. 2001), the Fifth Circuit Court of Appeals rejected a similar argument in the bankruptcy context based on *Reading* to the one Catalina makes in the instant case. There, two companies, Total Minatome Corporation (Total Minatome) and Jack/Wade Drilling, Inc. (Jack/Wade), entered into a drilling contract, which provided for the prevailing party in any dispute under the contract to obtain attorney fees and expenses. *Id.* at 386. Thereafter, Jack/Wade filed for Chapter 7 bankruptcy, and its trustee in bankruptcy sued Total Minatome for breach of contract, alleging that it failed to pay Jack/Wade for its drilling services. *Id.* Total Minatome countersued and claimed that Jack/Wade breached the contract first by failing to properly drill, and ultimately, a jury rejected both claims of breach of contract at trial. *Id.* Although the jury rejected both parties' claims, the district court found that Total Minatome was the prevailing party and awarded it nearly $500,000 in attorney fees and expenses. *Id.* In turn, Total Minatome sought to have its award be given priority as an administrative expense in Jack/Wade's bankruptcy proceedings. *Id.* In rejecting this request, the Fifth Circuit Court of Appeals found that no circuit court of appeals had "extended *Reading* to cover debts incurred by a nonwrongful postpetition action to liquidate a chapter 7 bankruptcy estate." *Id.* at 388. The court concluded that *Reading* was not "intended to grant priority to post-

petition attorney fee awards resulting from a trustee's good faith attempt to liquidate the debtor's estate by bringing suit on a pre-petition contract." *Id.* at 389.

¶ 43    Similarly, in *In re Hemingway Transport, Inc.*, 954 F.2d 1, 6-7 (1st Cir. 1992), the First Circuit Court of Appeals denied administrative priority to a claim for attorney fees that arose out of postbankruptcy petition litigation, which was based on a prepetition contract. There, the court observed that the party's request for administrative priority of attorney fees could not "be distinguished on any principled basis from any other prevailing party's request for priority payment of attorney fees incurred in defending against a lawsuit brought by a chapter 7 trustee engaged in the routine liquidation of the assets of the chapter 7 estate." *Id.* The court acknowledged that "[a] chapter 7 trustee's lawsuit may indeed impose burdensome litigation expense upon successful and unsuccessful defendants alike, yet its *prepetition* genesis ultimately distinguishes it from the *postpetition* losses accorded priority" in *Reading.* (Emphases in original.) *Id.* at 7.

¶ 44    Like the bankruptcy trustees in *In re Jack/Wade Drilling* and *In re Hemingway Transport*, the Director, as liquidator of Legion's estate, demanded arbitration against Catalina based on preliquidation contracts in the process of faithfully carrying out his or her duties to liquidate the estate. And, as the circuit court observed in granting the Director's motion to allow, there is no evidence the Director, as liquidator, instituted the arbitration in bad faith. As such, we find *Reading* and its progeny inapposite to the instant circumstances. Furthermore, *In re Jack/Wade Drilling* and *In re Hemingway Transport* only reaffirm our conclusion that Catalina's adverse award of attorney fees, costs, and interest are not costs and expenses of administration.

¶ 45    Catalina cites additional bankruptcy cases to support its position that its adverse award of attorney fees, costs, and interest are costs and expenses of administration. For instance, in *In re E.A. Nord Co.*, 78 B.R. 289, 292 (Bankr. W.D. Wash. 1987), the United States Bankruptcy Court

for the Western District of Washington concluded that an arbitrator's award of attorney fees and costs arising from a bankruptcy debtor's pursuit of legally frivolous litigation postpetition constituted an administrative expense. The court reasoned that such a finding was necessary due to "the critical need to discourage parties from wasting valuable time and causing needless expense" by pursuing "frivolous litigation." *Id.* But, as discussed, there is no evidence that the Director's demand for arbitration was legally frivolous. *In re E.A. Nord* is therefore inapposite.

¶ 46    In another bankruptcy case, *In re Execuair Corp.*, 125 B.R. 600, 601 (Bankr. C.D. Cal. 1991), Whittaker Corporation (Whittaker) obtained an injunction against Execuair Sales Corporation (Execuair) that prohibited Execuair from selling certain aircraft parts. After Execuair allegedly violated the injunction, Whittaker initiated a contempt action. *Id.* While the contempt proceedings were ongoing, Execuair filed for bankruptcy. *Id.* Thereafter, a federal court found that Execuair had violated the injunction and awarded Whittaker attorney fees. *Id.* The United States Bankruptcy Court for the Central District of California concluded that the award of attorney fees should be considered an administrative expense because it was based on a "post-petition act by the debtor-in-possession or trustee which was intended to benefit the estate but which led to the injury of a third party." *Id.* at 604. However, *In re Kadjevich*, 220 F.3d 1016, 1021 n.4 (9th Cir. 2000), the Ninth Circuit Court of Appeals "disapprove[d]" of the holding in *In re Execuair*. As such, Catalina's reliance on *In re Execuair* is unavailing.

¶ 47    Lastly, during oral argument in this appeal, Catalina maintained that the proceedings were fundamentally unfair to it because the Director, as liquidator of Legion, failed to follow the statutory notice requirements and provide it timely written notice of the pendency of claims. See 215 ILCS 5/193(8)(b) (West 2002). But the arbitration panel attempted to rectify this perceived unfairness by two means. First, the panel found that the Director's failure to comply with the

Insurance Code relieved Catalina of any obligation to pay any amounts owed under the reinsurance treaties, which was allegedly close to $1 million. And second, the panel awarded Catalina the adverse award of attorney fees and costs in the amount of $437,501.04 with interest for which Legion's estate became responsible. When entering arbitration, Catalina was staring down the prospect of a net loss of some $900,000 (when including the alleged unpaid premiums owed to it by Legion), but Catalina left the arbitration with Legion actually owing it some $500,000, which was a direct result of the arbitration panel remedying the inequities suffered by Catalina. Given this result, Catalina cannot credibly argue that the entire liquidation proceedings were so unfair toward it. And even if the proceedings were fundamentally unfair toward Catalina, resulting in Catalina being potentially unable to obtain full payment from Legion's estate on its claim for the attorney fees, costs, and interest, it does not follow that the adverse arbitration award should be deemed "costs and expenses of administration" where the plain language of section 205(1)(a) of the Insurance Code (215 ILCS 5/205(1)(a) (West 2020)) and the case law provide otherwise. See *In re Liquidation of Legion Indemnity Co.*, 2013 IL App (1st) 120980, ¶ 16 ("[T]he rule of absolute priority established under section 205 of the [Insurance] Code also limit the Liquidator and trial court in considering special circumstances, providing preferential treatment, or otherwise fashioning some form of equitable relief.").

¶ 48    In sum, based upon the plain and ordinary meaning of the phrase "costs and expenses of administration" and our supreme court's decision in *In re Liquidations of Reserve*, 122 Ill. 2d at 558, 563-64, 568, the circuit court correctly concluded that Catalina's adverse award of attorney fees, costs, and arbitration interest should be allowed at the priority level (g) for claims of general creditors (215 ILCS 5/205(1)(g) (West 2020)) and not at the priority level (a) for costs and expenses of administration (*id.* § 205(1)(a)).

¶ 49                          B. Statutory Postjudgment Interest

¶ 50     Catalina next contends that the circuit court erred by not awarding it postjudgment interest under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)), beginning when the federal district court confirmed its arbitration award and converted it into a judgment and ending when the circuit court allowed its claim on September 27, 2021. As a purely legal issue, we review Catalina's alleged entitlement to postjudgment interest *de novo*. *Eclipse Manufacturing Co. v. United States Compliance Co.*, 381 Ill. App. 3d 127, 141 (2007).

¶ 51     Section 2-1303(a) provides that "judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied," subject to certain exceptions not relevant for this appeal. 735 ILCS 5/2-1303(a) (West 2020). In multiple decisions, this court has found that an award of postjudgment interest under section 2-1303 is mandatory. See *Inman v. Howe Freightways, Inc.*, 2022 IL App (1st) 210274, ¶ 77 ("The circuit court has no discretion in awarding interest; rather, the court is required to award interest on a judgment."); *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 62 ("The trial court has no discretion to deny postjudgment interest, as the imposition of statutory interest from the date the final judgment was entered is mandatory."). According to section 2-1303(a), "[t]he judgment debtor may by tender of payment of judgment, costs and interest accrued to the date of tender, stop the further accrual of interest on such judgment notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." 735 ILCS 5/2-1303(a) (West 2020).

¶ 52     In rejecting Catalina's request for postjudgment interest, the circuit court acknowledged that postjudgment interest under section 2-1303 was mandatory, but found that, under *Finley*, 81 Ill. 2d 317, it had discretion as a chancery court to disallow postjudgment interest when it would

not comport with justice and equity. In *Finley*, a mother sought payment from the father of her children for child-support arrearages and interest on the arrearages. *Id.* at 322. At the time, there were no statutes providing for interest on unpaid child support payments. *Id.* at 331-32. The circuit court granted the mother's request for interest on the arrearages. *Id.* at 322. Ultimately, our supreme court addressed whether the allowance of interest on the past-due child support was discretionary or mandatory. *Id.* at 331. In resolving the question, our supreme court looked at *Bremer v. Bremer*, 4 Ill. 2d 190, 192 (1954), and observed that it previously "held that a divorce proceeding partakes so much of the nature of a chancery proceeding that it must be governed to a great extent by the rules that are applicable thereto." *Finley*, 81 Ill. 2d at 332. And "[i]n a chancery proceeding, the allowance of interest lies within the sound discretion of the trial judge and is allowed where warranted by equitable considerations and is disallowed if such an award would not comport with justice and equity." *Id.* In light of this, our supreme court "conclude[d] that the allowance of interest on past-due periodic support payments is not mandatory" but rather "lies within the sound discretion of the trial judge." *Id.*

¶ 53    Years after *Finley* was decided, our supreme court reexamined the case in *Illinois Department of Healthcare & Family Services ex rel. Wiszowaty v. Wiszowaty*, 239 Ill. 2d 483 (2011). There, the court observed that *Finley* stood "for the proposition that, *where there are no controlling statutes* defining unpaid support payments as judgments or providing for interest, interest may be awarded on those payments as a discretionary matter because the divorce proceeding may be likened to a chancery proceeding." (Emphasis in original.) *Id.* at 489. The court added that *Finley* did "not stand for the proposition that interest is left to the discretion of the circuit court even when governing statutes have plainly stated otherwise." *Id.* As a result, in the instant case, given that the plain language of section 2-1303 (735 ILCS 5/2-1303 (West 2020))

indicates that postjudgment interest is mandatory, *Finley* did not provide the circuit court discretion over whether to allow postjudgment interest.

¶ 54    Despite the inapplicability of *Finley*, that does not mean that postjudgment interest is proper in this case given the unique nature of liquidation proceedings. This brings us to *In re Liquidation of Pine Top*, 322 Ill. App. 3d 693, the second case relied upon by the circuit court in rejecting Catalina's request for postjudgment interest. There, a woman was killed in an apartment building, and her estate filed a lawsuit against the owner of the building, who was covered under an insurance policy issued by Pine Top Insurance Company. *Id.* at 695. During the pendency of the litigation, the circuit court determined that Pine Top was insolvent and ordered it to undergo liquidation proceedings. *Id.* Subsequently, the estate of the woman filed a claim against Pine Top, which the circuit court allowed at the priority (d) level. *Id.* at 696. Two years later, upon the Director's motion, the court approved a 50% distribution on priority (d) claims, resulting in the Director paying half of the estate's claim. *Id.* More than four years after that, the Director moved for a second 50% distribution on priority (d) claims. *Id.* In the motion, the Director included language indicating that the proposed second distribution would fully satisfy Pine Top's obligations on the underlying claims. *Id.* The estate objected to that language and asserted that, because it was entitled to interest under section 2-1303 from the date its claim was allowed to the date when the claim was paid at the same priority level as its claim, the proposed second distribution would not fully satisfy Pine Top's obligation to the estate. *Id.* at 697. Ultimately, the court denied the estate's claim for postallowance interest. *Id.*

¶ 55    On appeal, this court framed the question as "whether a claimant whose claim is allowed against an insolvent insurance company in liquidation proceedings under Article XIII of the Insurance Code is entitled to interest on its claim pursuant to section 2-1303 of the Code of Civil

Procedure, payable at the same priority level as the claim itself." *Id.* at 699. In resolving this question, we highlighted the fixing provision of the liquidation statute and its purpose "to stop the running of any debts, including postjudgment interest, against the insolvent insurer in order to give the liquidator an opportunity to marshal the insurer's assets and pay its debts." *Id.* at 703-04. We then analogized to proceedings under the liquidation provisions of the Insurance Code to federal bankruptcy and equitable receivership proceedings. *Id.* at 704. In turn, this court observed that the United States Supreme Court had "offered several policy reasons for the rule against allowing the payment of any interest accruing after the filing of a bankruptcy petition or the appointment of a receiver," including:

> "(1) that the delay in paying the claimants the amount owed them is a necessary incident to the settlement of the estate and that, as such, the accrual of interest as a penalty for nonpayment is not appropriate; (2) that considerable administrative inconvenience would be caused by requiring continuous recomputation of interest and, correspondingly, continuous recomputation of claims; and (3) that different creditors would unfairly experience gain or loss based on the dates on which their claims were paid." *Id.* (citing *Nicholas v. United States*, 384 U.S. 678, 689 (1966); *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163-64 (1946)).

¶ 56    This court found the same policy reasons "support a finding that postallowance interest should not be allowed on claims against an insolvent insurance company in a liquidation proceeding." *Id.* at 705. First, this court observed that the Director, as liquidator, cannot pay each claim at the time it was allowed due, in part, to the priority distribution scheme. *Id.* Second, we noted that payment of postallowance interest would cause the amount of a claim to be constantly

recomputed, which would cause administrative delays and inconvenience. *Id.* Lastly, this court asserted that permitting postallowance interest would harm certain creditors and benefit others based upon events the creditors largely have no control over. *Id.* at 705-06. Therefore, we affirmed the circuit court's denial of the estate's request for postallowance interest at the same priority level as its claim.

¶ 57     Turning to the present case, we acknowledge that the interest request in this case is different than in *In re Liquidation of Pine Top Insurance*, where a claimant sought only postallowance interest. Here, on the other hand, Catalina seeks interest beginning when the federal district court confirmed its arbitration award and converted it into a judgment until the time the circuit court allowed its claim. Despite Catalina's request for postjudgment interest not aligning perfectly with the estate's request for postallowance interest in *In re Liquidation of Pine Top Insurance*, the policy reasons for precluding postallowance interest are similar to the policy reasons precluding postjudgment interest here. First, allowing postjudgment interest would artificially inflate the amount of Catalina's claim. The federal district court granted Catalina's petition to confirm its arbitration award and converted that award into a judgment in April 2020. It took Catalina two months to file proofs of claims with the OSDR, which it did only concerning the unpaid premiums. And ultimately, in November 2020, the Director filed a motion to allow Catalina's claims, which included the adverse award of attorney fees and costs despite Catalina never filing an actual proof of claim on this award. The Director only included the adverse award of attorney fees and costs in his motion to allow because he knew this claim was still outstanding. Although in the instant case, it was the Director who filed the motion to allow Catalina's claims, nothing prevented Catalina itself from filing the motion to allow, as it seemed to acknowledge during argument in the circuit court on the Director's motion to allow. This timeline shows that allowing postjudgment interest

could open liquidation proceedings up to potential gamesmanship by claimants, who could increase their claim amounts by using various delay tactics. "[J]udgment interest that is awarded pursuant to section 2-1303 of the Code of Civil Procedure merely preserves the value of the liquidated obligation by compensating the judgment creditor for delays in payment." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 157 Ill. 2d 282, 295 (1993). It would be incongruous with the purpose of postjudgment interest if a claimant itself could delay payment and then reap the reward of its own delay.

¶ 58    Additionally, allowing postjudgment interest would cause administrative burdens and thwart the purpose of the priority distribution scheme. If claimants could make tactical decisions and delay filing claims, as Catalina possibly did in this case, it would create a disorderly and inefficient process for liquidating the assets of insolvent insurance companies, which is antithetical to the purpose of the priority distribution scheme. See *In re Liquidation of Lumbermens*, 2018 IL App (1st) 170996, ¶ 31. Finally, allowing postjudgment interest would also penalize the estate of an insolvent insurance company based on reasons beyond the control of the Director, as liquidator. Because of the priority distribution scheme, the Director cannot pay claimants immediately upon allowance of their claims. Rather, the Director must go through the statutory process, which generally requires court approval and contains a specific priority of distribution. See 215 ILCS 5/205, 209(13) (West 2020). It would be unfair to award postjudgment interest as a penalty for nonpayment. See *In re Liquidation of Pine Top*, 322 Ill. App. 3d at 705 ("[A]s the liquidator cannot, for reasons beyond his control, pay claims on the date on which they are allowed, it would be unfair to award postallowance interest as a penalty for nonpayment.").

¶ 59    As such, similar to *In re Liquidation of Pine Top*, we conclude that it is inconsistent with the priority distribution scheme to allow the award of postjudgment interest on claims against an

insolvent insurance company in liquidation under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)). Still, Catalina tries to distinguish the instant case from *In re Liquidation of Pine Top* and notes that the decision involved a preliquidation debt that was subject to the Insurance Code's fixing provision (see 215 ILCS 5/194(a) (West 2020)), whereas the instant case involves a postliquidation debt not subject to the Insurance Code's fixing provision. This claimed distinction does not negate the critical policy rationales for not allowing postjudgment interest emanating from claims in liquidation proceedings. Although this court has held that postjudgment interest under section 2-1303 is mandatory (see *Inman*, 2022 IL App (1st) 210274, ¶ 77), article XIII of the Insurance Code nonetheless provides that "[t]he pleadings and proceedings insofar as not otherwise regulated by [Article XIII], shall be as in other civil proceedings." 215 ILCS 5/190(4) (West 2020). Because the priority distribution scheme regulates the payment of claims, we find section 190(4) of the Insurance Code supersedes the mandatory nature of postjudgment interest under section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2020)). Accordingly, the circuit court correctly concluded that Catalina was not entitled to any postjudgment interest under section 2-1303.

¶ 60                                III. CONCLUSION

¶ 61     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62     Affirmed.

*In re Liquidation of Legion Indemnity Co.*, 2023 IL App (1st) 211370

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 02-CH-06695; the Hon. Celia G. Gamrath, Judge, presiding. |
| **Attorneys for Appellant:** | Neal R. Novak and Jennifer E. Arnold, of Novak Law Offices, of Chicago, for appellant. |
| **Attorneys for Appellee:** | J. Kevin Baldwin, Daniel A. Guberman, and Dale A. Coonrod, of Special Deputy Receiver's Office, and Patrick Morales-Doyle and Ryan J. Gehbauer, of Thompson Coburn LLP, both of Chicago, for appellee. |